COURT OF
APPEALS

                                                    EIGHTH DISTRICT
OF TEXAS

                                                               EL
PASO, TEXAS

 

                                                                              )     

MARIA ESPERANZA VELEZ,                            )                    No. 
08-01-00246-CV

                                                                              )

Appellant,                          )                             Appeal from

                                                                              )     

v.                                                                           )                       65th District Court

                                                                              )

CHARLES JOHN MITSAK,                                )                 of El Paso County, Texas

                                                                              )

Appellee.                           )                     (TC# 2001-CM-3717)

 

O
P I N I O N

 

This
appeal concerns the Hague Convention[1]
(AConvention@)
as implemented by the United States in the International Child Abduction
Remedies Act[2]
(AICARA@),
and involves a request by a father for an order requiring a mother to return
their child to Spain, the country from which the child was removed in
1999.  The issue is whether the trial
court erred in according full faith and credit to an Italian judgment that
adjudicated a prior Convention petition and ordered the child returned to
Spain.  We reverse and remand.

FACTUAL AND PROCEDURAL SUMMARY








 Maria Esperanza Velez and Charles Mitsak are
the parents of Ezra Mitsak, born in El Paso, Texas on September 15, 1997.  Aside from the child=s
date of birth, Velez and Mitsak dispute almost every fact leading up to the
filing of this suit on May 21, 2001.[3]
According to Velez, she and Mitsak were teachers employed abroad as civilian
employees of the United States Department of Defense.  While the parties dispute whether they were
married, Velez and Mitsak lived together for a period of time in Spain, but
separated in January or February 1999. 
Velez left Spain with Ezra and traveled to Italy.  Mitsak claims that Velez did not tell him
where she was going.  After he discovered
that Velez was living and working in Italy, he filed for custody in a Spanish
court and sought the return of the child under the Hague Convention in an
Italian court.  Velez claims that she,
her daughter, and Ezra were physically abused by Mitsak during their stay in
Spain.  She also claims that she was
transferred to Italy by the Department of Defense and that Mitsak was aware of
her transfer.  

In
early December 1999, the Spanish court gave custody to Velez although she was
unaware of the ruling until much later. 
On December 22, 1999, the Italian court heard Mitsak=s Convention application and ordered
that Mitsak could return with Ezra to Spain for a custody decision.  Velez contends that Mitsak obtained the
Italian order fraudulently because he did not inform the court that Velez had
already been granted custody in Spain. 
Mitsak contends that the Spanish order has since been vacated.  In turn, Velez alleges that she has initiated
proceedings in Italy to have the Italian order set aside.  She also claims to have initiated further
proceedings in Spain where an order has been entered and appealed by
Mitsak.  








Mitsak
disputes that Velez has appealed the Italian order.  He argues that she simply ignored the order,
fled from Italy and did not tell him where she was going.  He located her in Mexico and filed a
Convention petition there but Velez allegedly would not comply with any court
orders for visitation.  He also maintains
that Velez submitted to the federal court in Mexico either a fake Mexican birth
certificate or a legitimate B
but fraudulently obtained B
birth certificate which listed the last name of the child as Velez rather than
Mitsak.  Mitsak discovered that Velez had
returned to El Paso in May 2001.  He
filed a petition for the return of the child under the Convention in the 65th
District Court of El Paso County, Texas on May 21.  The petition alleged in pertinent part:

3.1  Petitioner has rights of access to the child
within the meaning of Articles Three and Five of the Convention in that the
child was wrongfully removed from Spain in February 1999 without the consent of
Petitioner.  Petitioner learned the child
and his mother were in Italy and he filed under the Convention to have the
child returned to him.  Before the child
was turned over to him, Respondent disappeared from Italy with the child.  In February of 2000, a Spanish court granted
Petitioner rights of access to the child. 
However, Petitioner has not been given access to the child.  The Interpol Police has submitted a request
to Mexico to locate the child so Petitioner could have access. 

 

3.2  The Petitioner at the time of the wrongful
removal or retention was actually exercising custody within the meaning of
Articles Three and Five of the Convention.

 

*
* * * *

 

3.3  The child was born on September 15, 1997 in
El Paso, Texas and will be sixteen (16) years of age on September 15, 2013,
twelve years after the date of this application.

 

3.4  The child was habitually resident in Spain
within the meaning of Article Three of the Convention immediately before the
removal of the child from Spain by Respondent.

 

*
* * * *

 

5.1  Spain has not issued an order for custody of
the child in favor of Petitioner. 
However, Petitioner has filed proceedings in Spain to gain custody. 

 








Mitsak also
filed a petition for a warrant in lieu of a writ of habeas corpus under the
Convention, based on a breach of his right to custody and/or access within the
meaning of Article 3 of the Convention. 
The court issued a warrant on May 22, ordering that the child be taken
into protective custody and released to Mitsak. 
Velez filed a motion for injunctive relief on May 24, expressing her
fear that if Mitsak were given possession of the child, he would remove Ezra
from the jurisdiction of the court.  She
also alleged that Mitsak had a long history of domestic violence, had directed
violence toward Velez=s
daughter, and had made threats to harm Ezra. 
The court granted her injunctive relief and ordered the child returned
to the custody of Child Protective Services.

Velez
filed her original answer to Mitsak=s
petition on June 4.  She claimed that
removal of the child was not wrongful because on December 2, 1999 the Spanish
court had awarded custody of the child to her and established scheduled visits
for the parties.  She also specifically
pled defensive theories that (1) there was a grave risk that Ezra=s return would expose him to physical
or psychological harm or otherwise place him in an intolerable situation; (2)
that Mitsak had filed his petition more than one year following the alleged
wrongful taking and that the child had settled in a new environment; and (3)
that there was a question as to whether Mitsak was exercising custody rights at
the time of the alleged wrongful removal.

Mitsak
filed a first amended petition on June 5. 
He reiterated his claims that he had custody rights to the child and
that the child was wrongfully removed from Spain.  In support of his claims, he attached an
e-mail and two letters as exhibits.  The
e-mail, from Esther Pias Garcia of the Spanish Central Authority, stated:

Dear Guillermo,

 








I would like to
communicate to you that the Judge of First Instance No. 4 of El Puerto de Santa
Maria, has given the custody to Mr. 
Mitsak.  For this reason, Mr.
Mitsak=s lawyer
is going to change the request, demanding now the return of the child instead
of the right of access.  He will send all
the documents to the american [sic] lawyer in El Paso.  

 

The letters were
also from Ms. Garcia.  She wrote that
Velez left Spain on January 9, 1999, traveled to Italy and Mexico, and was
currently in the United States.  She also
stated that there was Aa
wrongful removal, because in Spain, the State in which the child was habitually
resident immediately before the removal, according to Article 154 of the
Spanish Civil Code both parents have parental responsibility for the children.@ The second letter stated in pertinent
part:

[T]here is a  new judicial decision of 1.09.2000 the First
Instance Court of El Puerto de Santa Maria discharging the decision of the
First Instance court of El Puerto de Santa Maria of 2.12.1999.  Consequently now both parents have parental
responsibility in respect of the child.

 

Also attached to
the petition was the Italian judgment, accompanied by a purported English
translation, which ordered the return of the child to Spain.  The translation stated that Ezra was a
habitual resident with his parents at their residence in El Puerto de Santa
Maria, Spain until February 1999 when his mother extracted him without notice
to or prior knowledge of the father.  It
also stated that Articles 154 and 156 of the Spanish Civil Code were
applicable; these provisions grant both parents the rightful custody of their
children.  The translation also recited
that Velez=s
allegations[4]
had not been substantiated, did not demonstrate child endangerment, and were
not valid reasons for failing to return Ezra to Spain.  








Velez
filed a first amended original answer on June 7.  She pled that she and Mitsak were civilian
members of the Asending
state,@ and that
they and their child were not subject to the same legal status as the citizens
of the Areceiving
state@ under
the Convention.  Consequently, she urged
that Mitsak=s
petition be dismissed.   

A
hearing on Mitsak=s
application was conducted on June 8 in the El Paso district court.  Counsel for Velez sought a continuance and
argued that the English translation of the Italian judgment contained a Adiscrepancy or an omission@ in that Mitsak had failed to advise
the Italian court of the Spanish custody order. 
Counsel for Mitsak opposed the continuance and argued that this was a
summary proceeding according to the Hague Convention.  He claimed that a continuance would cause
hardship to his client, who had come from Spain for the hearing, and a hardship
for Ezra, who had been in foster care since May 23.  The court denied the continuance.  Although Mitzak=s
attorney advised the court that he had witnesses available, he suggested Athat you don=t
even need to hear any testimony.@  Instead, he referenced the Italian judgment
and told the court Athat
decision should be given full faith and credit by you here today, Judge.  And . . . we don=t
need to litigate this any further.@   

The
trial court then read excerpts from a letter he received from the United States
Central Authority and commented on them as follows:

The U.S. Central
Authority writes to me and tells me as set forth:  >We
write to inform you that the Central Authority of Spain has submitted an
application for the return of Ezra Mitsak to Spain with the U.S. Central
Authority under the Hague Convention.  We
draw your attention to certain important articles of the Convention.  Article 11 of the Convention requires the
judicial or administrative authorities of contracting states,= and that=s
us here in the United States, >to
act expeditiously in proceedings for the return of children.=

 

In denying your
motion today, Mr. [counsel for Velez], that is exactly what I=m doing.  I am acting expeditiously to determine
whether or not this child is to be returned to Spain.

 








>In addition, judicial or
administrative authorities of the contracting state to which the child has been
removed or in which it was been retained shall not decide on the merits of
rights of custody until it has been determined that the child is not to be
returned under this Convention or unless an application under this Convention
is not lodged within a reasonable time following receipt of the notice.=

 

The guidelines that
the Central Authority has given me is that I=m
not to get into the merits of this case, i.e., who is entitled to this child,
who has custody of this child.  My only
decision to be made here today is whether or not this child is to be returned
to Spain.  

 

They also invite my
attention to Article 17, which provides that the sole fact that a decision
relating to custody has been given in or is entitled to recognition in the
requested state, that=s
us, shall not be a grounds for refusing to return the child under this
Convention, but the judicial or administrative authorities of the requested
state may take account of the reasons for that decision in applying this
convention.

 

I=m assuming that means that just because
there is an order in Italy, that doesn=t
mean that the child is returned automatically. 
I can consider it as a reason for returning the child solely.

 

*
* * * *

 

The purpose of me
getting this on the record is so that the parties are aware that I have
reviewed all of these documents.  I
believe I have brought myself up to speed on the Hague Convention and I think I=m quite familiar with it.  

 

The
court then asked the parties whether there were any orders to be presented from
any court in any other country.  Mitsak
offered into evidence the Italian judgment and the English translation, both of
which were admitted.  He also offered the
two letters and e-mails we have already discussed and two birth
certificates.  Only the American birth
certificate was admitted.  Mitsak also
introduced an Interpol warrant written in Spanish stating that return of the
child could not be accomplished because the mother had left Italy with the
child.  Velez=s
objections to this exhibit were sustained. 








Mitsak
did not testify in support of his petition. 
Although his counsel did not specifically address the seventeen-month
time lapse between Velez=s
departure from Italy with Ezra and the filing of the petition in El Paso, he
did argue that Velez has Aa
whole history@ of
hiding and abducting the child.  Velez=s counsel attempted to address the
validity of the Italian judgment in light of Mitsak=s
failure to notify the court of the prior Spanish custody award.  As the attorneys began to argue, the court
instructed them to take their seats.  He
then ruled without hearing any oral testimony. 
The written order provides: 

The Judgment of the
Italian court from December 1999 ordering that the child be returned to Spain
in accordance with the Hague Convention was amongst the exhibits admitted in
accordance with 42 U.S.C.A. 11605.  The
Court assumes that the translation of the judgment was correct and gives full
faith and credit to that judgment in accordance with 42 U.S.C.A. 11603(g).  Said judgment orders the child be returned to
Spain in accordance with the Hague Convention. 

 

IT IS ORDERED that,
pursuant to the provisions of The Convention on the Civil Aspects of
International Chid Abduction, done at the Hague on 25 October 1980 and/or
the International Child Abduction Remedies Act, 42 U.S.C. 11601 et seq, CHARLES
MITSAK, shall return the minor child, EZRA MICHAEL MITSAK, . . . to his
residence and to retain possession of the child until such time as the Spanish
authorities make further orders.   

 

Later
that same day, Velez filed a motion for temporary emergency relief with this
court.  We granted the motion and ordered
all proceedings in the trial court stayed and barred the trial court from
enforcing its order returning the child pending our ruling on Velez=s petition for writ of mandamus.  Before our order could be delivered to the
parties, Mitsak left the jurisdiction with Ezra.  Velez filed a writ of mandamus on June 12 and
a notice of appeal on June 27.  The writ
of mandamus and the appeal were consolidated for purposes of argument.    








In
Point of Error One, Velez argues that the trial court erred in granting full
faith and credit to the Italian court=s
judgment pursuant to ICARA.  See
42 U.S.C.A. '
11603(g).  Consequently, she contends the
trial court had no subject matter jurisdiction to grant full faith and credit
to a judgment by a court of a foreign country. 
In her second point, Velez complains that according full faith and
credit to the Italian judgment caused the court to deny an evidentiary hearing
on whether it should defer to the Italian judgment.  In her third and fourth points, Velez
contends the trial court=s
failure to hear testimony on these material issues denied her due process of
law under the United States Constitution and constitutes reversible error.[5]

STANDARD
OF REVIEW

In
reviewing the trial court=s
adjudication of Mitsak=s
Convention petition, we apply a de novo standard.  While no other court in Texas has reviewed a
trial court=s
determination of whether to give deference to an earlier Convention petition
adjudicated by a foreign court, the issue has arisen in the federal
context.  In Diorinou v.
Mezitis, the United States Court of Appeals for the Second Circuit
addressed the deference that a United States court should accord to a judgment
of another country which has adjudicated a prior Convention petition.  Diorinou v. Mezitis, 237 F.3d 133 (2nd
Cir. 2001).  The court concluded that
although the standard of review had not been explicitly articulated, the
appellate courts should consider de novo the proper application of full
faith and credit, res judicata and comity.  Id. at 138-40.

THE
HAGUE CONVENTION








The
Convention seeks to provide a remedy for international child abductions and to
restore the Afactual@ status quo which is unilaterally
altered when a parent abducts a child.  Flores
v. Contreras, 981 S.W.2d 246, 248 (Tex.App.--San Antonio 1998, no
pet.).  The United States ratified the
Convention in 1986 and became a contracting state in 1988 through the federal
implementing statute--ICARA.  ICARA
confers concurrent original jurisdiction in state and federal courts over
actions arising under the Convention.  See
42 U.S.C.A. '
11603(a).  Jurisdiction is granted only
as to the merits of the abduction claim; the statute does not grant
jurisdiction to decide the underlying custody dispute.  Id.; Lops v. Lops, 140 F.3d 927
(11th Cir. 1998); Friedrich v. Friedrich, 78 F.3d 1060, 1063 (6th Cir.
1996); Flores, 981 S.W.2d at 248. 
Under the Convention, each country has a Central Authority which is
responsible for discharging the duties imposed by the Convention and
cooperating with the Central Authorities of other countries to secure the
return of children.  Convention, arts. 6,
7.  Article 1 of the Convention provides
that the objectives are twofold:

(a)  to secure the prompt return of children
wrongfully removed to or retained in any Contracting State; and

 

(b)  to ensure that rights of custody and of
access under the law of one Contracting State are effectively respected in the
other Contracting States.

 

Convention, art.
1.  Courts have also acknowledged a
separate purpose of deterring parents from crossing borders in search of a more
sympathetic court.  Friedrich, 78
F.3d at 1063.

Under Article 3
of the Convention, a Aremoval@ or a Aretention@ is Awrongful@ if:

 

(a) it is in breach
of rights of custody attributed to a person . . . either jointly or alone,
under the law of the State in which the child was habitually resident
immediately before the removal or retention; and

 

(b) at the time of
removal or retention those rights were actually exercised, either jointly or
alone, or would have been so exercised but for the removal or retention.

 

Convention, art.
3.  AHabitual
residence@ is not
defined in either the Convention or ICARA, but instead must be applied to the
facts and circumstances of each case.  Flores,
981 S.W.2d at 249.  








In
determining whether there has been a wrongful removal or retention, the court
may take judicial notice of the law and judicial decisions Ain the State of the habitual residence
of the child, without recourse to the specific procedures for the proof of that
law or for the recognition of foreign decisions which would otherwise be
applicable.@  Convention, art. 14.  To obtain a remedy under the Convention, a
petitioner must show by a preponderance of the evidence that the child has been
wrongfully removed within the meaning of the Convention.  42 U.S.C.A. '
11603(e)(1)(A); In re Prevot, 59 F.3d 556, 560 (6th Cir. 1995).  The application, together with the documents
or any other information appended to the application or provided by the Central
Authority, is admissible in the courts of the contracting states.  Convention, art. 30.

Once
the petitioner has established these requisite elements, the party opposing the
return of the child has an opportunity to raise various defenses:

Notwithstanding the
provisions of the preceding Article, the judicial or administrative authority
of the requested State is not bound to order the return of the child if the
person . . . which opposes its return establishes that--

 

(a)
the person . . . having the care of the person of the child was not actually
exercising the custody rights at the time of removal or retention, or had
consented to or subsequently acquiesced in the removal or retention; or

 

(b)
there is a grave risk that his or her return would expose the child to physical
or psychological harm or otherwise place the child in an intolerable situation.

 

Convention, art.
13.  Article 20 further permits a court
to refuse to return the child Aif
this would not be permitted by the fundamental principles of the requested
State relating to the protection of human rights and fundamental freedoms.@ 
Convention, art. 20.  The party
opposing return of the child must establish the defenses in Article 13b and
Article 20 by clear and convincing evidence. 
42 U.S.C.A. '
11603(e)(2)(A).  Any other defense in
Article 13 must be established by a preponderance of the evidence.  42 U.S.C.A. '
11603(e)(2)(B).  The person opposing the
return of the child may also attempt to show by a preponderance of the evidence
that the proceeding was not initiated within one year of the wrongful removal
or retention and that the child has settled in his or her new environment:








Where a child has
been wrongfully removed or retained in terms of Article 3 and, at the date of
the commencement of the proceedings before the judicial or administrative
authority of the Contracting State where the child is, a period of less than
one year has elapsed from the date of the wrongful removal or retention, the
authority concerned shall order the return of the child forthwith. 

 

Even where the
proceedings have been commenced after the expiration of one year, the court
shall order the return of the child unless a party demonstrates that the child
is now settled in its new environment. 
Convention, art. 12; 42 U.S.C.A. '
11603(e)(2)(B).  If the person opposing
the return of the child does not establish one of these defenses, the return of
the child is mandatory.  See Friedrich,
78 F.3d at 1067 (AOnce a
plaintiff establishes that removal was wrongful, the child must be returned
unless the defendant can establish one of four defenses.@).  However, even if a party proves one of the
defenses available, the return of the child is a matter of judicial
discretion.  Convention, art. 18 (AThe provisions of this Chapter do not
limit the power of a judicial or administrative authority to order the return
of the child at any time.@).  Furthermore, these defenses have been
narrowly construed.  Friedrich, 78
F.3d at 1068-69.  At least one court has
held that a federal court should exercise its discretion when appropriate Ato return a child, despite the
existence of a defense, if return would further the aims of the Convention.@ 
Id. at 1067, citing Feder v. Evans-Feder, 63 F.3d 217, 226
(3d. Cir. 1995).

FULL FAITH AND CREDIT UNDER 42 U.S.C.A. ' 11603(g)

It
is clear from the record before us that the trial court=s
decision to defer to the Italian judgment and order the child=s return to Spain was based on the
principles of full faith and credit mentioned in the Convention=s implementing legislation:

Full faith and
credit shall be accorded by the courts of the States and the courts of the
United States to the judgment of any other such court ordering or denying the
return of a child, pursuant to the Convention, in an action brought under this
chapter.








42 U.S.C.A. ' 11603(g).  The term AState@ is defined as Aany
of the several States, the District of Columbia, and any commonwealth,
territory, or possession of the United States. . . .@  Id. at Section 11602(8).  Only one federal circuit court has
interpreted the meaning of this ICARA provision.  See Diorinous v. Mezitis, 237 F.3d
133, 142 (2nd Cir. 2001).  There, the
appellate court reviewed a decision to accord full faith and credit to a
Convention adjudication by a Greek court. 
Id.  The court reasoned
that it might be possible to read AStates@ in Section 11603(g) to mean AContracting States@ if the definition in Section 11602(8)
were understood to define only the singular AState@ and not the plural AStates@.  But the legislative history Aclearly indicates@ that the word AStates@ in Section 11603(g) refers to the
states of the United States.  Id. citing
H.R.Rep. No. 100-525, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 386,
393-94 (ASection
4(g) provides that full faith and credit shall be accorded throughout the
United States to judgments and orders of courts in the United States
rendered with regard to return actions pursuant to the Convention and the Act.)
(emphasis added).@[6]  Moreover, the court pointed to the
Restatement (Second) of Conflict of Laws as support for the proposition that
judgments rendered in a foreign nation are not entitled to full faith and
credit as a general matter.  Id. citing
Restatement (Second) of Conflict of Laws
' 98 cmt. b (1971).  However, American courts will nevertheless
accord considerable deference to foreign adjudications as a matter of comity:








Even if the limited
scope of section 4 implies a legislative preference not to extend formal full
faith and credit recognition to foreign judgments, we see nothing in ICARA or
its legislative history to indicate that Congress wanted to bar the courts of
this country from giving foreign judgments the more flexible deference normally
comprehended by the concept of international comity.  

 

Id. at 143.

 

Following
the reasoning in Diornous, we believe the district court misapplied
ICARA=s full
faith and credit provision as a basis for according deference to the Italian
judgment.  Instead, the trial court
should have determined deference as a matter of comity, particularly on the
issue of whether the Italian judgment was obtained by fraud.  See Restatement
(Second) of Conflict of Laws '
98 (1971).  The exercise of comity is at
the heart of the Convention.  See
Blondin v. Dubois, 189 F.3d 240, 248 (2nd Cir. 1999).  The comments to Section 98 of the
Restatement (Second) of Conflict of Laws reveal that:

Judgments rendered
in a foreign nation are not entitled to the protection of full faith and
credit.  In most respects, however, such
judgments, provided that they are valid under the rule of ' 92,[7]
will be accorded the same degree of recognition to which sister State judgments
are entitled. 

 








Restatement (Second) of  Conflict of Laws ' 98 cmt. b. (1971).  As a condition of recognition, an American
court must be convinced that the foreign court had jurisdiction and that Athere is nothing to show either
prejudice in the court, or in the system of laws under which it is sitting, or
fraud in procuring the judgment.@  Restatement
(Second) of Conflict of Laws '
98 cmt. d (1971), citing Hilton v. Guyot, 150 U.S. 113, 202 (1895).  Points of Error One and Two are sustained.

DUE PROCESS

Having
determined that the trial court misapplied Section 11603(g), we now turn to the
due process issues.  Velez claims that
although ICARA contemplates a summary proceeding rather than a full trial, the
guarantees of due process under the United States and Texas Constitutions apply
such that she should have been given an opportunity to be heard.  She asks that we reverse and remand for an
evidentiary proceeding.

At
the hearing below, Velez advised the court that the Italian judgment was
fraudulently obtained in that Mitsak did not notify the Italian court of the
Spanish order that awarded custody to her. 
Although not a model of clarity, we can also discern from the record
that Velez objected that the English translation of the Italian judgment
contained errors related to Mitsak=s
alleged history of domestic violence against her and her children.  Mitsak counters that Velez was granted due
process because she was given notice of the proceeding, she appeared at the
hearing, and she was represented by counsel. He argues that the Convention
contemplates that courts will summarily decide matters and promptly return the
child to his or her habitual residence.  








The
Due Process Clause of the Fifth Amendment provides that no person shall Abe deprived of life, liberty or
property without due process of law.@  U.S.
Const., art. V.  Procedural due
process is examined in two steps: we must determine first, whether a litigant
has been deprived of an existing liberty interest, and second, whether the
procedures attendant upon the deprivation of the liberty interest were
constitutionally sufficient.  Egervary
v. Rooney, 40 F.Supp.2d 491, 498 (E.D. Pa. 2000), citing Kentucky Dep=t. of Corrections v. Thompson , 490
U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).  The courts have consistently held that
parents have a fundamental liberty interest in the custody of their
children.  Egervary, 40 F.Supp.2d
at 498-99, citing Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir.
1997)(mother had a constitutionally protected liberty interest in the custody
of her children which could not be deprived without due process); Jordan v.
Jackson, 15 F.3d 333, 342 (4th Cir. 1994)(few rights are more fundamental
than those of parents to retain custody of their children); Weller v. Dep=t. of Soc. Servs., 901 F.2d 387,
391 (4th Cir. 1990)(father had a clear liberty interest in the custody of his
children); Robison v. Via, 821 F.2d 913, 921 (2nd Cir. 1987)(parent=s interest in custody of children is
constitutionally protected interest which cannot be deprived without due
process); Hooks v. Hooks, 771 F.2d 935, 941 (6th Cir. 1985)(parents have
a liberty interest in the custody of children); Lossman v. Pekarske, 707
F.2d 288, 290 (7th Cir. 1983)(father had a liberty interest in custody of
children); Duchesne v. Sugarman, 566 F.2d 817, 825 (2nd Cir.
1977)(liberty interest in familial privacy). 


As
to the second prong, we must determine whether the procedures by which Velez
was deprived of her liberty interest were sufficient.  The opportunity to be heard Amust be granted at a meaningful time
and in a meaningful manner.@  Armstrong v. Manzo, 380 U.S. 545, 552,
85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). 
ICARA provides that notice Ashall
be given in accordance with the applicable law governing notice in interstate
child custody proceedings.@  Egervary, 80 F.Supp.2d at 499, citing
42 U.S.C. '
11603(c).








Courts interpreting
this provision have found the >applicable
law= to be the Parental Kidnaping
Prevention Act, 28 U.S.C. '
1738A (>PKPA=), and the Uniform Child Custody
Jurisdiction Act, 23 Pa.C.S.A. '
5341, et seq. (>UCCJA=). 
. . .  Both the PKPA and
UCCJA provide for >reasonable
notice and opportunity to be heard.=
. . .  This generally means >a plenary hearing at which both
sides are heard.=  [Citations omitted].

 

Id.

 

Velez
was not given an opportunity to present evidence at the June 8 hearing.  Cf. Morton v. Morton, 982 F.Supp. 675,
687-88 (D. Neb. 1997)(party opposing Convention petition for return of child
was accorded due process where she was granted a formal evidentiary hearing
which she refused to attend).  As the
petitioner, Mitsak was required to demonstrate by a preponderance of the
evidence (1) that Ezra was an habitual resident of Spain; (2) that he had
lawful custody rights to Ezra--either jointly or solely--when the child was
wrongfully removed; and (3) that at the time of removal, he was actually
exercising those rights or would have done so but for the removal.  The Italian judgment establishes the first
two requirements; it is silent as to the third. There being no evidence on the
issue, Mitsak failed to establish his prima facie entitlement to return
of the child.  Even had he done so, Velez
was entitled to the opportunity to establish the defenses she had pled and to
challenge the Italian judgment on the ground that it was procured by fraud.  It was surely not contemplated by the drafters
of the Convention that the provision requiring contracting states to use the
most expeditious procedures available to implement the objectives of the
Convention would override a party=s
right to present evidence on possible defenses as provided in the articles or
on considerations of whether a foreign judgment was obtained by fraud.  Points of Error Three and Four are sustained.

CONCLUSION

We
recognize that Mitsak and Ezra have left the jurisdiction and that our ruling
necessitates their return.  It may well
be that after a full evidentiary hearing, the trial court will order Ezra=s return 








to Spain.[8]  Nevertheless, we cannot gloss over the
niceties of the constitutional protections which are implicated here.  We reverse and remand for further
proceedings.

 

 

August 29, 2002

                                                                         


ANN CRAWFORD
McCLURE, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew,
JJ.

 

(Publish)

 











[1]  See Convention on the Civil Aspects of International
Child Abduction, Oct. 25, 1980, 51 Fed.Reg. 10494, 10498-502 (App. B) 1986.





[2]  See 42 U.S.C.A. ''
11601-11610 (1995).





[3]  Some of the
facts recited here are taken from the contentions of the parties in their
briefs in a parallel mandamus proceeding which was consolidated with this
appeal for purposes of argument.  We
have, by opinion issued this same date, denied the petition for writ of
mandamus because there exists an adequate remedy by way of appeal.  See In re Velez, No. 08-01-00228-CV
(Tex.App.--El Paso August 29, 2002, no pet. h.).  Neither party testified in the trial
court.  Because the record in this appeal
does not include sufficient material to provide a complete factual development,
we rely upon some of the factual assertions made in those briefs.  Notation is made of those factual assertions
that are disputed by the parties.  





[4]  According to
the translation, these Aaccusations and allegations@ referred to Athe
overdosed administration of aspirin to the child or the allege [sic] claim made
by the plaintiff as [sic] the effect that he >would
sacrifice his child as Isaac did if the defendant left his side.=@    





[5]   Velez assigns
a fifth point of error in which she generally complains of the order requiring
that Ezra return to Spain.  The argument,
however, merely constitutes an explanation as to why the case is not moot
despite the fact that the child has already left our jurisdiction.  





[6]  The paragraph
provides further: 

 

This means, for example, that if a court in one
jurisdiction has ordered the return of a child and a child             is located in another jurisdiction
in the United States before that order has been executed, the order shall be
given full effect in the second jurisdiction without the need to initiate a new
return action there pursuant to the Convention and the Act.  

 

Id. at 394.





[7]  ' 92.  Requisites
of a Valid Judgment

 

   A judgment is
valid if

 

(a) the state in which it is rendered has jurisdiction
to act judicially in the case; and

 

(b) a reasonable method of notification is employed and
a reasonable opportunity to be heard is afforded to persons affected; and

 

(c) the judgment is rendered by a competent court; and

 

(d) there is compliance with such requirements of the
State of rendition as are necessary for the valid exercise of power by the
court.

 

Restatement (Second) of
Conflict of Laws ' 92 (1971).





[8]  The fact that
a party may ultimately prevail has been found unpersuasive:

 

Defendants seek to moot the obvious conclusion that
plaintiff=s rights under ICARA were violated by arguing that Oscar
would have been immediately returned to Ms. Kovacs even if a hearing had been
held that day.  . . .  The Court cannot accept that conclusion.  Mr. Egervary had compelling, though not
necessarily dispositive, arguments that could have been presented if he had
been afforded notice and opportunity to be heard.

 

                                                                                                *
* * * *

 

The Court makes no finding as to whether Mr. Egervary
would have prevailed on any of these arguments. 
Such a finding would not be possible without a full evidentiary hearing
. . .  It is nonetheless clear that
plaintiff was deprived of any opportunity to present these arguments.

 

Egervary, 80
F.Supp.2d at 500-01.